UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SHAHADAT TUHIN,

Plaintiff,

- against -

NEW YORK MOTOR GROUP, LLC,
M&T BANK CORPORATION,
MAMDOH ELTOUBY,
JANE DOE IDENTIFIED AS "NADA," JOHN
DOE IDENTIFIED AS "JOHN"/"JAY"/"JULIO,"
JOHN DOE IDENTIFIED AS "MOHAMMED,"
JOHN DOE IDENTIFIED AS "DEWAN," and
JOHN/JANE DOES,

Defendants.

CV 13 - 5643

Case No. _____

ORIGINAL COMPLAINT AND JURY
DEMAND

VITALIANO, J.

POLLAK, M.J

Plaintiff, Shahadat Tuhin, brings suit against Defendant New York Motor Group, LLC

("New York Motor Group," "NYMG," or "seller"), M&T Bank, Mamdoh Eltouby and the

individual Jane and John Does for violating the Truth In Lending Act ("TILA"), 15 USC § 1601,

*et seq*; the Magnuson-Moss Warranty Act, 15 USC § 2301, *et seq.*; the NY Uniform Commercial

Code; the NY General Business Law; and related common law claims of fraud, breach of

contract, assault, and battery.

## A.   JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit under the Truth In Lending

Act pursuant to 15 USC § 1640(e); the Magnuson-Moss Warranty Act pursuant to 15 USC §

2310(d); and 28 USC § 1331 in that this dispute involves predominant issues of federal law.

Declaratory relief is available pursuant to 28 USC §§ 2201 and 2202.  The court has

supplemental jurisdiction under 28 USC § 1367 over Plaintiff's state law claims because said

1

claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Queens County, New York.

3.      Plaintiff is an individual who resides in Queens County, New York.

4.      Defendant New York Motor Group, LLC is a limited liability company organized under the laws of the State of New York with its principal office at 60-20 Northern Boulevard, Woodside, New York 11377.

5.      Defendant M&T Bank Corporation is a corporation organized under the laws of the State of New York with its principal office at 1 M&T Plaza, 12th Floor, Buffalo, New York, 14203.

6.      Defendant Mamdoh Eltouby is an individual defendant who resides and/or does business in New York State.  Upon information and belief, he owns New York Motor Group, located at 60-20 Northern Boulevard, Woodside, NY 11377.

7.      Defendants Jane and John Does are individual defendants who reside and/or do business in New York State.  Upon information and belief, all are employed by New York Motor Group, located at 60-20 Northern Boulevard, Woodside, NY 11377.

### B.    STATEMENT OF FACTS

8.      Shahadat Tuhin, 41, is a husband and father of three children.  He works long hours to try to support his family, but he does not make a great deal of money.  His nine-year-old daughter has a heart defect that requires repeated acute hospital treatment, including surgery.  Mr. Tuhin

needed a safe, reliable car to drive his daughter to the hospital for her regular medical interventions.

9. On June 19, 2013, Mr. Tuhin went to New York Motor Group seeking to purchase a 2008 Lexus ES 350 ("vehicle"), advertised on the seller's website for $14,995. As Mr. Tuhin was inexperienced at buying cars, he brought his friend with him.

10. A sales manager, the John Doe identified as "Mohammed," and a salesperson, the John Doe identified as "Dewan," told Mr. Tuhin that the advertised car had been in no accidents and ran well. Mr. Tuhin stated that he would not agree to purchase the car until he received a CarFax report.

11. Mohammed informed him that he had to sign a sales contract before he could obtain financing, which is not true. As a result, he was fraudulently induced into signing a sales contract for $13,995. Mr. Tuhin made a $2,000 cash down payment.

12. The terms, "Must Finance through NYMG" and "Subject to lenders [sic] Approval," were not written on the sales contract Mr. Tuhin originally signed. The seller later added these terms to the contract.

13. After Mr. Tuhin waited for several hours, Mohammed informed him that the finance manager had left for the day and instructed him to return the next day.

14. On June 20, 2013, Mr. Tuhin and his friend returned to New York Motor Group seeking to finalize the terms of the financing agreement for the $13,995 sale. After a several-hour wait, Mohammed informed Mr. Tuhin that the finance manager had a family emergency and was not

in that day. He was advised to return the next day.

15.     On June 21, 2013, Mr. Tuhin and two friends returned to New York Motor Group seeking to finalize the terms of the financing agreement. After waiting for several hours, Mr. Tuhin was called into the finance manager's office by the salesperson, Dewan. Despite several requests by Mr. Tuhin, Dewan refused to allow Mr. Tuhin's friends to join him. After Mr. Tuhin refused to purchase the car otherwise, the finance manager allowed one of them to accompany him, but only on the condition that the friend give his driver's license to the finance manager.

16.     The finance manager, John Doe, identified himself at different times as "John," "Jay," and "Julio." He told Mr. Tuhin and his friend that the car would be financed for 60 months. For the first six months, a 5.84% interest rate would apply. If he made these six payments on time, the interest rate would drop to 2.17% for the remaining 54 months.

17.     Mr. Tuhin agreed to these terms and conditions. When he asked for them in writing, the finance manager said his software did not let him print them. The finance manager instructed Mr. Tuhin to sign a blank retail installment contract. Mr. Tuhin refused to sign the blank contract and stated that he would not agree to purchase the car until he reviewed the CarFax report, received a written warranty that the vehicle was in good condition, and test drove the vehicle. The finance manager then informed Mr. Tuhin that the dealership was closing for the day and that he would have to return the next day to sign the paperwork. He was permitted to test drive the car, but only for five minutes and only in the vicinity of the dealership.

18.     On June 22, 2013, Mr. Tuhin and his friend returned to New York Motor Group seeking to finalize the terms of the financing agreement. After waiting for several hours, Mr. Tuhin's

4

friend left. Mr. Tuhin then met with the finance manager. He received the CarFax report, which indicated that, contrary to the seller's representations, the car had been involved in three accidents. He also observed that the car had new body damage since he had seen it on June 19, 2013.

19.     Mr. Tuhin refused to purchase the vehicle. However, the finance manager told Mr. Tuhin that if he did not go through with the sale, he would be liable for 35% of the price of the vehicle. This material representation was untrue and was made solely to intimidate Mr. Tuhin to sign additional papers. . Mohammed then said New York Motor Group would reduce the price of the vehicle to $12,000. Afraid that he would be responsible for 35% of the $13,995 purchase price, in exchange for nothing, Mr. Tuhin felt he had no choice but to agree to purchase the car for $12,000.

20.     The finance manager repeated the general financing structure he had laid out the day before, but with smaller monthly payments to reflect the lower total sales price of $12,000. He told Mr. Tuhin that the car would be financed for 60 months. The finance manager falsely stated that, only for the first six months, the monthly payments would be $433.43, with an interest rate of 5.84%, for a total of $2,600.58. The finance manager falsely told Mr. Tuhin that if he made these six payments on time, for the remaining 54 months, the interest rate would drop to 2.17%, and the monthly payments would be $128.32, for a total of $6,929.28. In all, he would pay $9,529.86, plus his cash down payment. The finance manager falsely explained that the car price would balloon to $26,209 only if Mr. Tuhin missed any of the first six payments.

21.     The finance manager assured Mr. Tuhin that their conversations were being recorded,

pointing to cameras installed in the office, to mislead Mr. Tuhin into believing there would be video proof of these oral agreements and disclosures. (Defendants have refused to produce these so called recordings despite repeated demands by the undersigned).

22.     The finance manager then showed Mr. Tuhin a sales contract for $22,795.87. Mr. Tuhin questioned this amount because it was much larger than the agreed-upon price. The finance manager informed him that the higher price only reflected the amount he would have to pay if he missed one of the first six payments, as agreed. Mr. Tuhin refused to sign this sales contract. He asked that the agreed-upon purchase price of $12,000 be clearly reflected.

23.     The finance manager then showed Mr. Tuhin a sales contract for $12,000. Based on the representation that it reflected the financing scheme orally described, Mr. Tuhin agreed to sign it. The finance manager rushed Mr. Tuhin and obscured the paper so that he could not see the areas surrounding his signatures. Mr. Tuhin asked for a copy and was told that he would be given one when he left.

24.     Mr. Tuhin then signed a series of unknown documents purporting to reflect the agreed-upon terms. The finance manager and salespeople rushed Mr. Tuhin through the signing of each document, folding over and covering the pages in order to physically block his view of them. The finance manager also prevented Mr. Tuhin from holding and reading the documents in their entirety before signing. In fact, when Mr. Tuhin tried to pick up one of the documents, the finance manager grabbed it and said "don't touch."

25.     New York Motor Group intentionally deceived, coerced, isolated, pressured, and exhausted Mr. Tuhin. These high pressure sales tactics wore him down so that he would sign

whatever they placed in front of him.

26.     The finance manager told Mr. Tuhin he was required to pay an additional cash fee to purchase the car.  When he refused, they agreed to treat it as an additional down payment, of whatever quantity he could pay.  He gave them the $30 he had in his wallet and an additional $600 at the direction of the salesperson who drove him to a nearby ATM to withdraw more money.

27.     When Mr. Tuhin returned home, he discovered that, despite the express representations of New York Motor Group and without knowing the nature of the document, he had unknowingly signed the buyer's order for $22,795.87, which he had previously refused to sign. This is an increase of $10,795.87, or 90%, more than the agreed-upon price of $12,000.00, and $7,800.87, or 52%, more than the advertised price.  He had also unknowingly signed a retail installment contract for $26,209 plus $4,997.96 in finance charges.  Under this retail installment contract, the monthly payment of $433.43 must be made for 72 months, not six months as the finance manager represented.  Both contracts reflected a down payment of only $2,000, instead of the $2,630 that Mr. Tuhin had paid.  They also reflected various "add-ons" that Mr. Tuhin never agreed to purchase, including a $3,000 service contract and $90 "VSI insurance." Furthermore, Mr. Tuhin was not given, as promised, a copy of the signed sales contract for $12,000.

28.     The sales and retail installment contracts materially differ from the financing agreement reached between Mr. Tuhin and New York Motor Group.  There was no meeting of the minds as to the terms contained therein.  Instead, New York Motor Group fraudulently induced Mr. Tuhin

into signing these contracts by misrepresenting the terms, physically hiding the papers, and using high pressure sales tactics.

29.    On information and belief, New York Motor Group never obtained a service contract, but instead simply inflated the sales price of the vehicle by $3,000 and pocketed the difference.

30.    On information and belief, New York Motor Group never obtained VSI Insurance, but instead simply inflated the sales price of the vehicle by $90 and pocketed the difference.

31.    New York Motor Group did not provide Mr. Tuhin with the statutorily required disclosures. It did not give Mr. Tuhin a copy of the odometer disclosure statement or a certificate of merchantability as required by NY Vehicle and Traffic Law § 417.

32.    New York Motor Group provided Mr. Tuhin with only one set of keys to the vehicle, keeping possession of the other set.

33.    After he returned home and discovered what he had been induced into signing, Mr. Tuhin panicked. He called the assignee finance company, Defendant M&T Bank, but it was closed for the day.

34.    The next day, June 23, 2013, at 10:15 a.m., Mr. Tuhin called M&T Bank again, and spoke to Shelly and a supervisor, Tim, in the Fraud Department. He provided his social security number, and stated that he was the victim of fraud and wanted to cancel his loan.  The representatives were unable to locate his account.  They told him to call the Credit Department the following day.

35.    On June 24, 2013, at 8:25 a.m., Mr. Tuhin called M&T Bank's Credit Department.  He

spoke to Kathy, who transferred him to Terry. He provided his social security number, and stated that he was the victim of fraud and wanted to cancel his loan. Terry said that she could not help him and transferred him to Diana. He repeated the purpose of his call. Diana informed him that she could not do anything for him, such as providing further information or placing a red flag on his account. She said that, if a dealership submits an application with a signature, they have to approve it unless there are credit issues. She continued that, in a case of fraud, he could only contact the State Attorney General. This call terminated at 8:50 a.m.

36.     That same day, Mr. Tuhin returned to New York Motor Group and orally revoked his acceptance of the vehicle due to fraud. He told Mohammed he never agreed to the inflated sales price contained in the contracts he had been fraudulently induced into signing. He began crying and stated that, if he had to make these payments, he would not be able to afford his rent and his family would lose its apartment. Nada and the finance manager repeated that the interest rate would drop significantly if he made the first six payments on time. The finance manager even handwrote the figures. But Mr. Tuhin persisted in his refusal, having seen the contradictory documents. Mohammed then told him they would cancel the sale, and to return the vehicle with the plates removed to the dealership lot.

37.     When Mr. Tuhin, along with two friends, brought the vehicle back that afternoon, several salespeople, including Dewan, refused to allow him onto the lot or accept possession. One salesperson threatened him that among the myriad papers he was pressured into signing without reading were divorce papers, and that they would file for divorce on his behalf if he bothered them again. The salesperson also threatened Mr. Tuhin with the fact that the dealership only gave him one car key, insinuating that it had retained the other and could take back the vehicle at

any time.

38.     On July 8, 2013, at 4:20 p.m., Mr. Tuhin called M&T Bank again and spoke to Sue in th

Credit Department.  He provided his social security number, and stated that he was the victim o

fraud and wanted to cancel his loan.  She confirmed that a loan had been approved under hi:

name but stated that she could not tell him the amount of the loan.  She stated that she could no

do anything about his fraud claim.

39.     Afraid of potentially negative credit consequences, Mr. Tuhin made the first two monthly

payments to M&T Bank before he retained legal representation.

40.     The vehicle is not merchantable; it violently shakes when driven and makes a loud

vibration noise that gets increasingly worse as it is driven.  Believing he had no choice but to

keep the car, Mr. Tuhin brought it to the dealership for servicing on July 12, 2013.  The

dealership failed to fix the mechanical problems, but instead replaced the car's four new tires

with old, worn tires.

41.     On or about August 7, 2013, Mr. Tuhin brought the vehicle to a mechanic for an

inspection.  The report diagnosed a problem with the alternator pulley end and recommended

$3,054.72 in repairs.

42.     On or about August 15, 2013, Mr. Tuhin and another victim of New York Motor Group's

fraudulent conduct obtained a permit and organized a protest at the dealership, where they met

other community members who had been similarly victimized.

43.     Although the protesters were peaceful, a man who identified himself as the owner

assaulted Mr. Tuhin and the protestors by attempting to run them over with his vehicle, leaving Mr. Tuhin terrorized and traumatized.

44.    After the owner nearly hit the protestors with the car, an employee of New York Motor Group, "John Doe," turned the hose he was using to wash a car onto the protestors, including Mr. Tuhin, spraying them with water.

45.    The New York Police Department responded to several 911 calls and ordered New York Motor Group to give Mr. Tuhin copies of the documents they had not provided.  As a result, he obtained the missing sales contract for $12,000, dated June 21, 2013, but signed on June 22, 2013.

46.    On September 13, 2013, after seeking the advice of counsel, Mr. Tuhin and two friends successfully delivered the vehicle and keys to New York Motor Group.   Through his undersigned counsel, he provided the dealership written confirmation of his prior oral rejection/revocation of acceptance under the NY Uniform Commercial Code, and made an unequivocal demand for the return of the down payment and for an accounting.  He then left, with the car securely parked on the lot.  Mr. Tuhin also surrendered his license plates to the Department of Motor Vehicles.

47.    To date, Mr. Tuhin has not received title to the vehicle and, therefore, was unable to deliver title to New York Motor Group.

48.    An employee, "Nada," informed the undersigned counsel that New York Motor Group subsequently placed dealership license plates on the car, drove it from the lot where it was securely located, removed the plates, and left the vehicle parked on the street, next to a fire

hydrant, around the corner from Mr. Tuhin's apartment. Several signs with Mr. Tuhin's name and address were attached to the inside of the car windows.

49.     A representative of the dealership went to Mr. Tuhin's home the night of September 13, 2013, and gave the car keys to his nine-year old daughter, telling her to give them to her father. This is the same nine-year old daughter who requires constant medical attention.

50.     On September 14, 2013, the undersigned counsel called New York Motor Group and asked to speak with whomever was in charge. She was transferred to the finance manager, who identified himself as John. The undersigned counsel informed him that Mr. Tuhin had lawfully exercised his right to reject/revoke acceptance under the NY UCC. She asked New York Motor Group to remove the car from the street and place it on the dealership lot while the question of legal ownership is resolved. John refused to negotiate or to place the vehicle in a secure location where potential damage would be minimized.

51.     On September 14, 2013, the undersigned counsel informed M&T Bank that its collateral was parked on the street with no license plates.

52.     On September 20, 2013, the undersigned counsel spoke with Mamdoh Eltouby, the owner of New York Motor Group, and informed him that Mr. Tuhin had lawfully exercised his right to reject/revoke acceptance under the NY UCC. The undersigned counsel asked that New York Motor Group remove the car from the street and place it on the dealership lot while the question of legal ownership is resolved. Mr. Eltouby refused to negotiate or to place the vehicle in a secure location where potential damage would be minimized.

53.     In short, New York Motor Group illegally abandoned an unlicensed car and left it,

uninsured, on a public road. The dealership has acted maliciously to retaliate against Mr. Tuhin with the clear intent to have tickets and fines accumulate in his name, and cause his driver's license to be suspended, thereby interfering with his livelihood, his family's well-being, and his ability to drive his daughter to the hospital. As of the date of this filing, at least one parking violation has been issued.

54. Because Mr. Tuhin surrendered the license plates after rejecting/revoking acceptance, he is unable to legally drive the vehicle. Afraid of the consequences if he did nothing, on or about October 3, 2013, Mr. Tuhin had the vehicle towed to a secure location. In so doing, he did not accept ownership of or liability for the vehicle. Rather, he retains physical possession solely in order to minimize damages, and further the public interest in keeping uninsured cars off the street.

55. Mr. Tuhin has felt constant stress and pressure since the night of June 22, 2013, when he discovered the contents of the contracts he had been fraudulently induced into signing. He has had insomnia, barely sleeping a few restless hours a night. He has isolated himself from his family and found it difficult to work.

56. When he saw that New York Motor Group had abandoned the vehicle on the street, Mr. Tuhin became even more anxious and scared that the problem was growing exponentially.

57. Despite receiving actual notice that the purported retail installment contract was fraudulent, M&T Bank continued to demand payment, and continues to do so as of the date of the filing of this Complaint. Therefore, M&T Bank has fully ratified New York Motor Group's fraudulent acts.

58.   The retail installment sales contract for the purchase of the vehicle was assigned to M&T Bank. Under the terms of the retail installment sales contract, M&T Bank is liable for all the claims and defenses that Mr. Tuhin could bring against New York Motor Group. Specifically, the retail installment sales contract states:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF.

59.   Also, M&T Bank is fully liable by ratification for the acts of New York Motor Group. After the bank was made aware of the dealership's fraud by Mr. Tuhin's calls and by the demand letter of the undersigned, the bank continued to retain the benefits of the fraudulent conduct fruit, *i.e.*, Mr. Tuhin's payments and obligations from the fraudulent sale.

60.   Mamdoh Eltouby, owner of New York Motor Group, is personally liable for the illegal conduct of this limited liability company ("LLC"), under the doctrine of piercing the corporate veil. Upon information and belief, he exercises dominance over the entity, effectively dictating its action, and abuses the privilege of doing business in the LLC form to perpetrate a wrong or injustice.

61.   Mr. Eltouby abuses the corporate structures of his various dealerships in order to perpetrate frauds. For example, on information and belief, Mr. Eltouby opens dealerships under a corporate structure. The dealerships then commit frauds from which Mr. Eltouby financially benefits but is shielded from liability. Furthermore, the dealerships are also shielded from the financial consequences of their fraudulent conduct because Mr. Eltouby proceeds to simply close them and open new dealerships under new names. Indeed, upon information and belief, New

14

York Motor Group may be changing the name on its sign even as this Complaint is being drafted. Accordingly, Mr. Eltouby is jointly and severally liable for all actions of New York Motor Group.

62.     Plaintiff made a "request for accounting" under NY UCC § 9-210 to New York Motor Group and M&T Bank regarding the vehicle. The accounting request was delivered to New York Motor Group by hand on September 13, 2013, and mailed to M&T Bank that same date. Pursuant to this request, New York Motor Group and M&T Bank were both required to provide specific written responses as to the interest each claimed in the vehicle, the basis of the assertion, and an accounting of the purported unpaid obligations, within 14 days of receiving the demand from the consumer. New York Motor Group and M&T Bank both failed to comply with the statutory requirements in the manner or within the time required by law.

63.     The undersigned counsel has repeatedly asked New York Motor Group and M&T Bank to send copies of the documents they claim bind Mr. Tuhin, including the sales contracts, retail installment contract, and credit application. In addition, the undersigned counsel has demanded that New York Motor Group preserve and deliver video recordings of the transaction, which it represented to have in its possession. To date, they have refused to comply with these requests.

64.     The listed misrepresentations are only by way of example and not limitation.

65.     There are alternate theories to this case, and each leads to Defendants' liability: either no valid contract was formed, due to Defendants' fraudulent conduct, or an unenforceable contract was formed, in violation of federal and state laws, as the product of duress, which was procedurally and substantively unconscionable.

15

**COUNT 1**
## VIOLATIONS OF THE TRUTH IN LENDING ACT AND REGULATION Z

66.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

67.    New York Motor Group and M&T Bank regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

68.    New York Motor Group and M&T Bank are both creditors within the meaning of the TILA, 15 USC § 1602(f) and Regulation Z § 226.2(a)(17).

69.    The purported contract lists a motor vehicle, an article of personal property, as collateral.

70.    The purported contract is a written agreement payable in more than four installments.

71.    The purported contract is a consumer credit transaction within the meaning of the TILA, 15 USC § 1602, and Regulation Z § 226.2.

72.    The finance charge indicated on the purported contract exceeds $1,000.

73.    Prior to the purported consummation of the contract, plaintiff was not provided with the TILA disclosures in a form that he, as a consumer, could keep.

74.    Plaintiff was not provided disclosures that conform with the obligations under the TILA and Regulation Z.

75.    The retail installment contract contains several "add-ons" that are in fact hidden finance

16

charges.

76.     The retail installment contract inaccurately lists the amount of the down payment as $2,000, instead of $2,630.

77.     As the TILA disclosures were not accurate, they should have been listed as estimates.

78.     New York Motor Group and M&T Bank violated TILA, 15 USC § 1638(a), (b) and Regulation Z §§ 226.17, 226.18.

79.     WHEREFORE, Plaintiff demands entry of judgment against New York Motor Group and M&T Bank for violating the Truth In Lending Act and Regulation Z, pursuant to 15 USC § 1640(a); statutory damages, costs and reasonable attorney's fees; rejection/revocation of acceptance, or, in the alternative, rescission of the purported contracts for the sale of the vehicle; voiding, as necessary, any claimed security interests in the vehicle; and any further relief this Court deems appropriate.

## COUNT 2
## VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT

80.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

81.     New York Motor Group did not make the terms of the vehicle's written warranty available to Mr. Tuhin prior to the sale.

82.     New York Motor Group breached the express warranty that the vehicle was in safe condition at the time of sale.

83.     New York Motor Group breached the implied warranty of merchantability. The vehicle was not in merchantable condition when (purportedly) sold, or at any time thereafter. The vehicle would not pass without objection in the trade as an undamaged car and was not fit for the ordinary purposes for which a 2008 Lexus ES is used.

84.     Plaintiff relied on the skill and judgment of New York Motor Group to select or furnish suitable goods, and New York Motor Groups knew or had reason to know that plaintiff was so relying.

85.     Nonconformities in the vehicle substantially impair its value to plaintiff, who did not know of these nonconformities prior to purchase and was misled by the assurances of New York Motor Group.

86.     Plaintiff notified New York Motor Group of the defects in the goods a reasonable time after he discovered the breach.

87.     Although Plaintiff rejected/revoked his acceptance of the vehicle in person on June 24, 2013, and by letter dated September 12, 2013, and tendered delivery of the vehicle on September 13, 2013, New York Motor Group and M&T Bank have failed and refused to honor Plaintiff's rejection/revocation of acceptance.

88.     New York Motor Group and M&T Bank violated the Magnuson-Moss Warranty Act, 15 USC § 2301, *et seq.*, and, in particular, 15 USC §§ 2302, 2310, directly and proximately causing Plaintiff losses and damages.

89.     WHEREFORE, Plaintiff demands entry of judgment against New York Motor Group and

M&T Bank for actual damages, attorney's fees and costs; rejection/revocation of acceptance, or, in the alternative, rescission of the purported contracts for the sale of the vehicle; and any further relief this Court deems appropriate.

## COUNT 3
## VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW

90.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

91.     New York Motor Group and M&T Bank committed deceptive acts or practices and used false advertising within the meaning of N.Y. Gen. Bus. Law §§ 349(a) and 350.

92.     New York Motor Group and M&T Bank engaged in materially misleading consumer-oriented conduct.

93.     Plaintiff is a person who has been injured by reason of the deceptive acts or practices of New York Motor Group and M&T Bank.

94.     Plaintiff brings suit pursuant to N.Y. Gen. Bus. Law §§ 349(h) and 350-e.

95.     Plaintiff seeks to enjoin the deceptive acts or practices of New York Motor Group and M&T Bank. Plaintiff has no adequate remedy at law.

96.     WHEREFORE, Plaintiff demands entry of judgment against New York Motor Group and M&T Bank for actual, treble, exemplary and punitive damages, attorney's fees and costs and injunctive relief; rejection/revocation of acceptance, or, in the alternative, rescission of the purported contracts for the sale of the vehicle; and any further relief this Court deems

appropriate.

## COUNT 4
## VIOLATIONS OF THE NEW YORK UNIFORM COMMERCIAL CODE

97.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

98.     Plaintiff rejected/revoked his acceptance of the vehicle in person on June 24, 2013, and by letter dated September 12, 2013, and tendered delivery of the vehicle on September 13, 2013. New York Motor Group and M&T Bank have failed and refused to honor this rejection/revocation of acceptance, in violation of NY UCC §§ 2-602, 2-608, and 2-721.

99.     On or about September 13, 2013, plaintiff made a "request," a "request for accounting," or a "request regarding a statement of account" within the meaning of the NY UCC § 9-210 to New York Motor Group and M&T Bank regarding the vehicle.

100.    Pursuant to NY UCC § 9-210, New York Motor Group and M&T Bank were both required to provide specific responses as to the interest claimed in the vehicle, and the basis of the assertion, within 14 days of receiving the written demand.

101.    New York Motor Group and M&T Bank both failed to comply with the statutory requirements in the manner or within the time required by law.

102.    WHEREFORE, Plaintiff demands entry of judgment against New York Motor Group and M&T Bank for actual and statutory damages pursuant to NY UCC §§ 2-711 and 9-625; rejection/revocation of acceptance, or, in the alternative, rescission of the purported contracts for the sale of the vehicle; and any further relief this Court deems appropriate.

## COUNT 5
### FRAUD

103.   Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

104.   On June 19, 2013, June 21, 2013, June 22, 2013, and June 24, 2013, employees of New York Motor Group, including individual Defendants Mamdoh Eltouby, John/Jay/Julio, Mohammed, Dewan, and Nada, made material and false representations about, but not limited to, the sales price, the financing terms, and the condition of the vehicle. When they made the representations, they knew them to be false, or made the representations recklessly, as a positive assertion, and without knowledge of its truth. They made the representations with the intent that they be relied upon. The representations were in fact relied upon, damaging Plaintiff.

105.   M&T Bank ratified the fraudulent acts of New York Motor Group by retaining the fruits of the fraud of New York Motor Group.

106.   As a result of the fraudulent acts of New York Motor Group, no valid contract was ever formed between Plaintiff and either New York Motor Group or M&T Bank.

107.   Plaintiff seeks actual, exemplary and punitive damages for these acts.

108.   WHEREFORE, Plaintiff demands entry of judgment against New York Motor Group, M&T Bank and the individual defendants for actual and statutory damages, exemplary and punitive damages, attorney's fees and costs and injunctive relief; rejection/revocation of acceptance, or, in the alternative, rescission of the purported contracts for the sale of the vehicle; and any further relief this Court deems appropriate.

## COUNT 6
## BREACH OF CONTRACT

109.   Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

110.   In the alternative, if a valid contract was formed, New York Motor Group breached the contract by failing to procure a service contract and VSI insurance, as promised, and by breaching the implied duty of good faith and fair dealing.

111.   WHEREFORE, Plaintiff demands entry of judgment against New York Motor Group and M&T Bank for actual and statutory damages, exemplary and punitive damages, costs and injunctive relief; rejection/revocation of acceptance, or, in the alternative, rescission of the purported contracts for the sale of the vehicle; and any further relief this Court deems appropriate.

## COUNT 7
## ASSAULT (AGAINST DEFENDANT MAMDOH ELTOUBY)

112.   Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

113.   Owner of New York Motor Group, Mamdoh Eltouby, intentionally placed Plaintiff in apprehension of an immediate battery when he attempted to run him over with his vehicle.

114.   WHEREFORE, Plaintiff demands entry of judgment against Mamdoh Eltouby for actual damages, and any further relief this Court deems appropriate.

22

## COUNT 8
## BATTERY (AGAINST DEFENDANT JOHN DOE)

115.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as though set forth fully and at length herein.

116.    Employee of New York Motor Group, John Doe, intentionally caused harmful or offensive conduct with plaintiff's person when he maliciously hosed him down with water.

117.    WHEREFORE, Plaintiff demands entry of judgment against John Doe for actual damages, and any further relief this Court deems appropriate.

### JURY DEMAND

118.    Plaintiff demands trial by jury.

### PRAYER

119.    For these reasons, Plaintiff demands judgment against New York Motor Group and M&T Bank for the following:

      i.    The above referenced relief requested;

      ii.    Rejection/revocation of acceptance of the purported contract for the sale of the vehicle, or, in the alternative, rescission of the purported contract.

      iii.    Actual damages;

      iv.    Statutory damages;

      v.    Treble, exemplary and punitive damages;

      vi.    Attorney's fees and expenses;

      vii.    Costs of court;

viii.   Prejudgment and post-judgment interest as allowed by law;

ix.   Costs of suit;

x.   General relief;

xi.   An injunction preventing Defendant from engaging in similar unlawful conduct now and in the future;

xii.   A declaratory judgment as to the obligations and ownership interests of the parties as to the payments for the subject vehicle.

xiii.   All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Respectfully submitted,

Carolyn E. Coffey (CC6741), and
Ariana Lindermayer (AL0625), of counsel to
Jeanette Zelhof, Esq.
MFY LEGAL SERVICES, INC.
Attorneys for Plaintiff
299 Broadway, 4th Floor
New York, NY 10007
Tel: (212) 417-3701
Tel: (212) 417-3742
Fax: (212) 417-3890
Email: ccoffey@mfy.org
Email: alindermayer@mfy.org

Ahmad Keshavarz (AK9602)
Attorney for Plaintiff
THE LAW OFFICES OF AHMAD KESHAVARZ
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809 (toll-free)
Email: ahmad@NewYorkConsumerAttorney.com